UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| MARY GIPSON, DWAYNE ASHLEY, VINCENT ASHLEY, and RAMONICA ASHLEY as the executor of the Estate of HOWARD ASHLEY,<br><br>　　　　　　　　　　Plaintiffs,<br><br>　　-against-<br><br>AMAZON.COM, INC. and AMAZON.COM SERVICES, INC.,<br><br>　　　　　　　　　　Defendants. | Docket No.: 1:19-cv-00462-RA<br><br>**FIRST AMENDED COMPLAINT and DEMAND FOR JURY TRIAL** |

Amazon.com, Inc. and Amazon.com Services, Inc.'s abhorrent corporate behavior, as set forth herein, led to the death of Ronald W. Ashley, their own dedicated, celebrated and well-liked human resource benefits executive.

Upon learning of Ronald's untimely death on December 4, 2016, Ronald's doctor, Dr. Frank Bishop stated, "I know the family is in shock, but I am stunned—he was not terminally ill."

Plaintiffs Mary Gipson, Dwayne Ashley, Vincent Ashley, and Ramonica Ashley, as the executor of the estate of Howard Ashley, (each a "Plaintiff" and collectively referred to hereinafter as "Plaintiffs"), as the heirs of the estate of Ronald W. Ashley, deceased, by and through their attorneys, KAPIN PLLC, as and for their First Amended Complaint (the "FAC") allege upon knowledge as to themselves and their own actions and upon information and belief as to all other matters alleged below as follows:

## NATURE OF THE ACTION

1.　This case involves the death of Ronald W. Ashley ("Ronald"), who died (alone) on

Monday, November 28, 2016, as a direct result of Defendants Amazon.com, Inc. and Amazon.com Services, Inc.'s failure to honor agreed upon short term benefits due to Ronald, who was a dedicated and talented human resources executive at Defendants' corporate headquarters.

2. As this stage of the litigation, it is not clear to the Plaintiffs whether:

   a. The short term benefits plan, which is the subject of this lawsuit, is an "ERISA" plan, governed by the Employee Retirement Income Security Act of 1974 ("ERISA"); or,

   b. The short term benefits plan is a "Payroll Practice" plan, exempt from ERISA under 29 C.F.R. 2510.3-1(b).

3. As a result of the foregoing, at the pleading stage, Plaintiffs plead claims *in the alterative* until it can be definitively determined whether application of state common law or ERISA governs this case.

4. While Plaintiffs plead their claims *in the alternative*, Plaintiffs believe the Defendants' short term disability plan, that is the subject of this lawsuit, is a "Payroll Practice" plan, and that it should be treated as a non-ERISA plan, even though Defendants may have attempted to characterize the subject plan as an ERISA plan. *See*, e.g., Langley v. DaimlerChrysler Corp., 502 F.3d 475 (6th Cir. 2006).

**THE PARTIES**

5. Plaintiffs, Mary Gipson ("Mary"), Dwayne Ashley ("Dwayne"), Vincent Ashley ("Vincent"), and Ramonica Ashley, as the executor of the estate of Howard Ashley, are the sole surviving heirs of Ronald, pursuant to an Heirship Affidavit issued by Harris County Probate Courts Department on October 25, 2017.

6.  Ronald died unmarried, had never married, and was without children.

7.  Mary, grief-stricken mother of Ronald, and sole surviving parent of Ronald, is an individual residing in Harris County in the State of Texas, with a residence address of 8000 Duffield Lane, Houston, TX 77071.

8.  Mary has suffered unbearable grief in learning that her son died, alone, and his body was found five days after his death. She was not able to say good-bye to her son, and to provide him with the traditional African-American burial custom of an open-casket funeral.

9.  Ronald's body was so badly decomposed, being found five days later, that Ronald had to be cremated. Ronald's family placed his ashes in a closed-casket for his funeral, in a symbolic gesture to allow the family to honor its tradition of burial.

10. Ronald, during his lifetime took great care of his mother, providing monthly support for her utility bills, groceries, housing costs, health care and supplemented her retirement income because she was a small business owner and did not have the retirement benefits Ronald worked to safeguard for employees throughout his career.

11. Mary further learned from the King County Coroner that Ronald's apartments was soaked in blood caused by nose bleeds from high blood pressure, which was increased due to the stress brought on by the impending eviction from his apartment due to the lack of financial resources, as a result of his short term income and health benefits being cancelled by Defendants.

12. Dwayne, brother of Ronald, is an individual residing in New York County in the State of New York, with a residence address of 515 West 38th Street, Apt 8G, New York, NY 10018.

13. Vincent, brother of Ronald, is an individual residing in Harris County in the state of Texas, with a residence address of 5002 Mallow Street, Houston, TX 77033.

14. Ramonica, as executor of the estate of Howard Ashley (who was a brother of Ronald) and as Howard's surviving heir, is an individual residing in Harris County in the state of Texas, with a residence address of 6711 River Bluff, Houston, TX 77085.

15. On or about October 25, 2017, an Heirship Affidavit was issued by the Probate Courts Department of the County of Harris, Texas, and the Plaintiffs, as a result thereof, are the sole beneficiaries of the estate of Ronald.

16. That at all times hereinafter mentioned, and on or about November 28, 2016, the Defendant AMAZON.COM, INC. was and is a foreign domestic business corporation, licensed in the state of Washington, duly authorized to conduct business in the State of New York.

17. That at all times hereinafter mentioned, and on or about November 28, 2016, the Defendant AMAZON.COM SERVICES, INC. was and is a foreign domestic business corporation, licensed in the state of Delaware, duly authorized to conduct business in the State of New York.

18. Upon information and belief, Amazon.com, Inc. is the parent company of Amazon.com Services, Inc. and therefore responsible for the illegal behavior of Amazon.com Services, Inc., as set forth herein.

19. Upon information and belief, at all times hereinafter mentioned, both AMAZON.COM, INC. and AMAZON.COM SERVICES, INC. did business as "Amazon."

**FACTUAL BACKGROUND**

20. A descendant of former slaves, Ronald was born on March 3, 1963, to loving family in Shreveport, Louisiana. His great grandmother donated the land for the first color school in Heflin, Louisiana and it now stands as one of the oldest black churches in the state of Louisiana.

21. Ronald was a highly sought after human resources specialist with a specialty in human resources technology benefits implementation. He saw his work as a social commitment to

employees and understood that "people" are companies' greatest asset.

22. On January 27, 2015, Ronald was offered a position with Defendants, pursuant to a written offer (the "Offer Letter"), as "Sr HR Business Analyst, MyTime." Amazon pursued and recruited Ronald to work for the company because of his vast experience and knowledge, and the challenges the company faced with aggressive growth and the need for enhanced human resources systems to serve their global workforce.

23. Ronald was provided the right to aggregate signing bonuses totaling $44,000.00, as compensation for his signing the Offer Letter and relocating to the Seattle, Washington area (the "Bonuses").

24. Ronald was provided a restricted stock unit award, wherein he was to be granted 275 shares of Amazon.com, Inc. common stock pursuant to a vesting schedule set forth in the Offer Letter (the "Restricted Stock Award").

25. Ronald was a dedicated executive working long hours and days with teams of Defendants' managers helping to resolve benefits issues globally. He mentored and served as a sponsor for several younger employees at the company.

26. Upon information and belief, as of Ronald's death, only 5% of the Restricted Stock Award has vested.

27. Upon information and belief, as of Ronald's death, Ronald may not have received his full signing bonus.

28. After signing the Offer Letter, Ronald commenced his employment with Defendants on or about February 16, 2015.

29. As a part of his employment offer, and pursuant to the Offer Letter, Ronald was "entitled to 401(k), health and welfare, vacation, and other benefits as may be offered by the Company

[Amazon] from time to time […]."

30. As a part of regular employment routine, on or about January 14, 2016, Ronald was given an Employee Questionnaire to complete. In said Employee Questionnaire Ronald disclosed a diagnosis of Human Immunodeficiency Virus, ("HIV") and problems with rectal inconsistencies, which caused him to use the restroom frequently and change his clothes five or six times a day.

31. On January 14, 2016, Dr. Shweta Baliga MD, Ronald's physician, completed a Healthcare Provider Questionnaire for Employee Accommodation Request. In said Questionnaire Dr. Baliga stated Ronald had a long-term physical impairment and anticipated the impairment of his rectal inconsistency to last one to two months. Dr. Baliga recommended Ronald to work from home.

32. Upon information and belief, Defendants had programs in place to accommodate employees who needed to work remotely, as a result of a medical condition.

33. On or about February 1, 2016, Ronald met with a colorectal specialist, Dr. Preetha Ali, regarding his arteriosclerotic cardiovascular disease, chronic hepatitis C without hepatic coma, impairment related to diabetes, and high blood pressure. Dr. Ali recommended a colonoscopy.

34. On or about early February 23, 2016, while on a business trip, Ronald fell getting out of the shower, exacerbating his then current health issues.

35. Due to the fall on or about February 23, 2016, Ronald sustained a T12 lower thoracic compression fracture, rendering him disabled.

36. Dr. Frank Bishop treated Ronald with pain medication and a back brace through May 11, 2016.

37. Due to above stated accident along with health issues diagnosed by Dr. Baliga and Dr. Ali, Ronald put in a request for a Leave of Absence and Accommodations and short-term disability benefits under the Defendants' Short-Term Disability Plan (the "Plan").

38.     To the extent the Plan is governed by ERISA (which it may or may not be), Defendants are required to administer the Plan in accordance with its written provisions.

39.     After Ronald's disclosure of disability, as a result of his fall on or about February 23, 2016, Defendants approved (although several weeks after first requested) and ultimately paid Ronald for short-term disability benefits, which he was entitled to under the Plan, through May 23, 2016.

40.     On or about May 27, 2016, Ronald's benefits were denied because Defendants claimed there was insufficient medical documentation to support Ronald's disability claim after May 27, 2016.

41.     After May 27, 2016, Ronald continued to see Dr. Bishop through October 26, 2016, to recover from his disability as a result of his February 23, 2016 fall.

42.     After May 27, 2016, Ronald made several attempts to appeal Defendants' decision to terminate his short-term disability benefits and simultaneously made requests to work from home.

43.     Defendants declined all requests to work from home, claiming Ronald would not be able to work from home, although company policy accommodated employees who needed to work remotely.

44.     Ronald's attempts to appeal the decision to terminate the short-term disability benefits were frustrated, in part, due to Defendants' lack of diligence in responding to the requests.

45.     This lack of response, which resulted in a denial of benefits, caused Ronald to go into a crippling depression, and furthered his inability to work.

46.     On or about October 25, 2016, Ronald visited Dr. Baliga's office again in an attempt to remedy his deteriorating health issues due to his disability and chronic illness.

47.     On or about October 26, 2016, Ronald visited Dr. Bishop's office to follow-up with

his deteriorating lower back problems caused by the February 23, 2016 fall.

48. In a detrimental state, Ronald attempted again to appeal Defendants' decision to terminate his short-term disability benefits by sending in an appeal request in early November 2016. The appeal request was received by Defendants on November 8, 2016, and was, apparently, lost by Defendants' appeals department until April 10, 2017, five months after Ronald passed away.

49. This neglect and inefficiency reflect the bureaucratic mess at Defendants' company as a result of the company's rapid expansion. Due to its fast development, this corporate gargantuan is unable to keep pace with imperative requests made by its employees, with essential requests being overlooked.

50. After Ronald's appeal requests and disclosure of continuing disability, Ronald was ignored by Defendants, at least in part, due to their inability to process the requests in an efficient manner to provide Ronald with a timely answer.

51. Plaintiffs also believe that Defendants' denial of Ronald's short term benefits was the result of intentional discrimination against Ronald.

52. After Ronald's workplace accident of February 23, 2016, Ronald's coworkers can attest to the fact that Ronald experienced further health issues related to the stress from financial hardship due to his disability and inability to receive necessary income and health benefits from Defendants.

53. Even with the knowledge of Ronald's disability and the notice of direness of his health issues that arose in connection to his disability, Defendants continued to ignore Ronald's requests and did not reasonably accommodate him.

54. Upon information and belief, in early October 2016, Ronald submitted a formal resignation to Defendants. Ronald, who was financially drained, and unable to fulfill his necessary prescription drug refills, was advised by human resources colleagues at Defendants' company that it would be

easier for Ronald to get health and prescription drug benefits reinstated if he resigned from Defendants, rather than continue to fight appeal after appeal with Defendants.

55. Ronald took the advice of his co-workers and resigned his position with Defendants.

## DEFENDANTS' ACTUAL KNOWELDGE

56. While Ronald was sick, after Defendants had improperly terminated Ronald's short term disability benefits, Gayle D. Childers, who, upon information and belief was Ronald's direct supervisor at the time, visited Ronald at his home residence, and observed Ronald's deteriorating condition.

57. Upon information and belief, Ms. Childers reported her observations about Ronald's condition to Defendants.

58. Upon information and belief, Ms. Childers was directed, by Defendants' staff, to prepare a report on Ronald's condition.

59. Ms. Childers also had several telephone calls with Ronald, further obtaining information about Ronald's deteriorating health and financial condition.

60. Upon information and belief, Ms. Childers provided information to Defendants about Ronald's continued disability as a result of the workplace injury of February 23, 2016.

61. Specifically, Ms. Childers reported Ronald's condition to her supervisor Christopher Bodlovic.

62. As a result of Ms. Childers report to Defendants, including to Mr. Bodlovic, Defendants had actual knowledge that Ronald was disabled and suffering, that Ronald needed the short term benefits he was contractually entitled to, and that failure to pay Ronald those short term benefits was certain to directly harm Ronald and very likely lead to his serious injury and death.

63. Defendants took deliberate action in failing to honor short term disability benefits for

Ronald. Given the actual knowledge of Ronald's medical disability, Defendants had actual knowledge that their denial of short term benefits would cause serious injury and/or death to Ronald.

64. Defendants willfully and improperly denied Ronald's claim for short term benefits.

65. Ronald filed appeal after appeal with Defendants, but Defendants, again, willfully refused to pay out benefits under the Plan for the period from approximately May 24, 2016 to August 23, 2016, notwithstanding Defendants' knowledge of Ronald's dire situation.

66. In or around mid-November 2016, after Ronald had already resigned from Defendants, Ronald wrote to Defendants' Chief Executive Officer, Chairman and President, Jeff Bezos.

67. Ronald emailed Mr. Bezos at his Jeff@amazon.com email address.

68. Upon information and belief at the time Ronald emailed Mr. Bezos, Ronald was no longer designated as an "active" employee as he had submitted a formal resignation.

69. To Ronald's surprise, Mr. Bezos called him directly. Upon information and belief, Mr. Bezos advised Ronald that he would look into the situation, fix the situation, do right by Ronald, and would be following up directly with Ronald shortly.

70. Upon information and belief, at the direction of Mr. Bezos, Ronald was reinstated with Defendants as an "active" employee.

71. At the time of Ronald's death, he was an "active" employee with Defendants.

## RONALD'S DEATH

72. On or about November 28, 2018, Ronald passed away at around the time of 2:00 a.m. at fifty-three years of age in his home at 12517 NE 23rd Pl Apt #B2, Bellevue, Washington 980051552.

73. Dwayne, Ronald's brother, was advised by the King County Coroner that Ronald died of

a heart attack.

74.  After Defendants discontinued paying Ronald's short term benefits, Ronald's financial condition began to deteriorate. In order to survive without income and other benefits from Defendants, Ronald had to deplete his savings. After depleting his savings, Ronald thereafter maxed-out all of his available credit card balances.

75.  Ronald was unable to fill necessary prescription drugs.

76.  In or around September 2016, Ronald's funds and access to funds were completely depleted.

77.  Ronald became unable to pay his landlord and in September 2016, his landlord began eviction proceedings.

78.  The financial problems that Ronald suffered when Defendants stopped paying Ronald's short term benefits were severe and caused Ronald debilitating stress.

79.  Prior to his death, Ronald kept Gayle Childers and other co-workers informed of his financial struggles and health struggles resulting from Defendants' actions.

80.  Ronald's heart attack, which was the cause of his death, was a direct result of the debilitating stress, compounded over several weeks, that Ronald suffered from May 2016 until his death.

81.  Ronald was first found deceased, alone in his apartment, approximately five days after his death, by his landlord.

82.  On the evening of Sunday, December 3, 2016, Mary, Ronald's mother, received a call from King's County Coroner Dr. William Barbour, informing her of Ronald's passing. Mary was in shock and asked Dr. Barbour to speak with her son Dwayne. Dr. Barbour called Dwayne and explained the circumstances of Ronald's death.

83.     The day after Ronald's body was first discovered, on Monday, December 4, 2016, Ronald's brother Dwayne Ashley, along with Cousins Clem Ashley, Chantel Hall and Marisa Hall, flew to Seattle to identify the body and to arrange for Ronald to be brought home to his family for a proper burial.

84.     King's County Coroner, Dr. Barbour met with the family and gave them Ronald's keys, wallet and other personal items. Dr. Barbour explained that Ronald had been identified by his driver's license and there would be no need for them to have to view his body for identification purposes.

85.     Dr. Barbour further cautioned the family that they needed to prepare themselves for visiting Ronald's home because Ronald had been bleeding profusely from his nose due to increased blood pressure. Ronald's apartment was covered in blood and was scattered with bloody towels Ronald had used to try to stop the nose bleeds that resulted.

86.     The family entered Ronald's apartment and witnessed first-hand the trauma and blood stained apartment, along with Ronald's back brace and other physical therapy items for his injuries scattered about his apartment.

87.     In the window box of the entrance to Ronald's apartment there were a number of budding Orchids Ronald was growing -- as he loved Orchids.

88.     Ronald's family met with Day Springs Finch Funeral Home to discuss funeral arrangements. They arranged for Ronald's remains to be picked up from Coroner's office on the morning of December 6, 2016. The director, Mr. Finch explained to the family that due to the decomposition, Ronald's body should not be shown in an open-casket funeral, and that Ronald's body might even have a foul odor.

89.     Dwayne called his mother and informed her that the body could not be shown and that

Ronald's funeral would have to be a closed-casket funeral.

90. Dwayne requested to view Ronald's body on his family's behalf, in hopes of bringing some comfort that Dwayne could tell his family that he had seen Ronald one last time to say good-bye for everyone. Unfortunately, Mr. Finch informed Dwayne that Ronald had a lot of dried blood on him and they would try to clean him up, but he did not recommend viewing the body because some of the skin could come off in trying to clean off the blood. As a result, the family made the decision to cremate, and they were unable to bury Ronald pursuant to family traditions. Ronald was cremated and the family put Ronald's ashes into a coffin, to at least have some sense of Ronald having a proper burial and funeral, and so Ronald's family and community would have an opportunity to say good-bye.

91. Upon information and belief, Gayle Childers was so distraught with what happened to Ronald, especially given the way Ronald was treated by Defendants, and her involvement in same, that she had to take a one month leave of absence from Defendants shortly after Ronald's death.

92. But for Defendants' inability to process Ronald's appeal requests for short-term disability in a timely and efficient and non-discriminatory manner, Ronald would not have met an untimely death, Ronald would not have suffered to the extent that he did prior to his death, and his family would not continue to suffer deep grief caused by this death.

## PAYROLL PRACTICES PLAN

93. Upon information and belief, under the Plan, Defendants pay employees normal compensation for periods of mental or physical disability entirely from Defendants' general assets, and, as such, the Plan is exempt from ERISA.

## AS FOR THE FIRST CAUSE OF ACTION: WRONGFUL DEATH

94. Plaintiffs repeat and reallege all prior facts with the same force and effect as if they were

set forth at length herein.

95. The death of the decedent, Ronald, was caused by the negligence of Defendants, as Defendants did not honor contractually agreed to and/or legally mandated benefits to Ronald.

96. Upon information and belief, Defendants had, through their agent, Gayle Childers, and through their agent Christopher Bodlovic, actual knowledge of Ronald's need for and right to the Plan benefits which were denied to him.

97. Upon information and belief, Defendants had, through their agents, Gayle Childers and Christopher Bodlovic, actual knowledge of Ronald's continued disability and illness, and that Ronald remained under doctors' care.

98. Upon information and belief, and as can be attested to by employees who worked for Defendants in their human resources department, at the time Ronald appealed the denial of short term benefits due to him under the Plan, Defendants' administration practices, with regard to the Plan, were negligently mismanaged.

99. Upon information and belief, and as can be attested to by employees who worked for Defendants in their human resources department, at the time Ronald appealed the denial of short term benefits due to him under the Plan, Defendants' administration practices, with regard to the Plan, were intentionally mismanaged.

100. Upon information and belief, Ronald was intentionally treated differently by Defendants when Defendants administered benefits under the Plan as a result of Ronald's race (African American), his sexual orientation (homosexual), and as a result of his HIV Status (HIV positive).

101. Upon information and belief, this different treatment resulted in the denial of payment to Ronald of short term benefits under the Plan.

102. As a result of Defendants' negligence, and intentional conduct, the Plaintiffs' intestate

suffered injuries from which he died on November 28, 2016.

103. The failure to pay Ronald employment earnings during the period his disability, i.e. when he was denied short term disability benefits by Defendants, directly resulted in Ronald's deterioration and stress, and was the "but for" cause of his death.

104. The deceased is survived by Mary, Dwayne, Vincent, and the estate of Howard Ashley, who have been damaged by Ronald's death in the sum of at least $6,586,000.00.

105. Plaintiffs have necessarily paid for the funeral and incurred other expenses in connection with the burial of Ronald.

## AS FOR THE SECOND CAUSE OF ACTION: BREACH OF CONTRACT

106. Plaintiffs repeat and reallege all prior facts with the same force and effect as if they were set forth at length herein.

107. Ronald entered into an employment agreement on or about February 16, 2015, with Defendants and formed a contract.

108. As a part of his employment agreement, Ronald was entitled to general benefits including 401(k), health and welfare, and vacation benefits.

109. As part of his employment agreement, Ronald was entitled to Bonuses.

110. As part of his employment agreement, Ronald was entitled to a Restricted Stock Award.

111. As per the agreement, Ronald fulfilled all of his obligations under his employment agreement.

112. As per his employment agreement, Ronald was entitled to health benefits, including short-term disability benefits.

113. Defendants did not fulfill their obligations to provide health, welfare and income benefits to Ronald while he was disabled.

114. Defendants had a duty to honor contractually agreed to, and/or legally mandated health care benefits.

115. Defendants breached their employment agreement with Ronald.

116. As a result of the foregoing unlawful actions by Defendants, Plaintiffs, as the sole legal heirs of Ronald's estate, have suffered damages arising from Defendants' breach of contract, in an amount believed to exceed $6,586,000.00.

## AS FOR THE THIRD CAUSE OF ACTION: NEGLIGENCE

117. Plaintiffs repeat and reallege all prior facts with the same force and effect as if they were set forth at length herein.

118. At all times relevant herein, Defendants had a duty to administer healthcare benefits to its employees in a reasonable manner.

119. Defendants breached that duty by ignoring numerous requests and appeals while also maintaining actual knowledge of Ronald's dire health condition and his immediate need for the subject short-term disability benefits, entitled to Ronald under the Plan.

120. Upon information and belief, the Defendants breached the duty owed.

121. Defendants' actions were unreasonable.

122. Defendants' actions were intentional and discriminatory.

123. But for Defendants' failure to provide Ronald appropriate short-term disability benefits, or process his appeal request in a timely, accurate and/or efficient manner, Ronald would not have suffered and then passed away.

124. Defendants' failure to provide short term healthcare benefits and process healthcare benefit requests in a timely and accurate manner was the direct and proximate cause of

Ronald's untimely death.

125. As a result of the foregoing unlawful actions by Defendants, Plaintiffs, as the sole legal heirs of Ronald's estate, have suffered and continue to suffer damages in the sum of at least $6,586,000.00, in forms including, but not limited to, loss of income, lost of future earnings and severe emotional distress, mental anguish, pain, and suffering.

### AS FOR THE FOURTH CAUSE OF ACTION:
### ERISA CLAIM UNDER 29 U.S.C. § 1132(a)(l)(B)

126. Plaintiffs repeat and reallege all prior facts with the same force and effect as if they were set forth at length herein.

127. To the extent that the Plan is determined to be governed by ERISA, Mary, the beneficiary of Ronald, pleads the following cause of action in the alternative.

128. Mary is the sole beneficiary of Ronald (for ERISA purposes), a participant in the Plan, which may be an ERISA plan administered by Defendants.

129. Under the terms of the Plan, Ronald was entitled to short term disability benefits which were not paid.

130. Following the untimely death of Ronald, Defendants failed to pay Mary amounts owed to her as a result of the improper denial of short term benefits under the Plan, owed to Ronald.

131. Defendants denied Mary such benefits on the basis that, "[a] review of the medical documentation, physician review and physician phone contact […] did not support that Mr. Ashley was unable to perform the material duties of his own occupation […]."

132. This basis for denial was improper, in that Defendants had actual knowledge that Ronald was under doctors' care and unable to perform the material duties of his own occupation, and that the denial of his short term disability benefits was wholly improper and Defendants' reasoning for denial was known by Defendants to be false.

133. Defendants' improper denial of short term disability benefits to Ronald was more than arbitrary and capricious, upon information and belief, it was undertaken intentionally and maliciously.

134. Accordingly, Mary seeks benefits due under the terms of the Plan pursuant to 29 U.S.C. § 1132(a)(l)(B).

### AS FOR THE FIFTH CAUSE OF ACTION:
### ERISA CLAIM UNDER 29 U.S.C. § 1132(a)(3)

135. Plaintiffs repeat and reallege all prior facts with the same force and effect as if they were set forth at length herein.

136. To the extent that the Plan is determined to be governed by ERISA, Mary, the beneficiary of Ronald (for ERISA purposes), pleads the following cause of action in the alternative.

137. Defendants were fiduciaries of the Plan and were obligated to act with "care" and "prudence" and "discharge [their] duties with respect to the plan solely in the interest of the participants and beneficiaries." See 29 U.S.C. § 1104(a)(l).

138. Defendants breached their fiduciary duties owed to Ronald by improperly denying short term disability benefits to Ronald, as set forth above.

139. During Ronald's life, Mary relied on Ronald for necessary financial support.

140. As a result of this breach, Mary is entitled to the <u>equitable remedies</u> of surcharge and/or restitution, pursuant to 29 U.S.C. § 1132(a)(3), for this misconduct by Defendants, specifically as it relates to Ronald's Bonuses and Restrictive Stock Awards agreed to pursuant to Ronald's Offer Letter.

141. As a result of this breach, Mary is entitled to the <u>equitable remedy</u> of front pay, pursuant to 29 U.S.C. § 1132(a)(3), for this misconduct by Defendants, specifically as it relates to

Ronald's potential future earnings, bonuses and stock awards at Defendants and/or any other position or company.

142. Front pay to Ronald's Plan beneficiary, Mary, is an appropriate <u>equitable remedy</u>, as Defendants' breach of fiduciary duty led to Ronald's death, the very act which makes it impossible for Ronald to be reinstated to his position at Defendants' employ.

143. Front pay to Ronald's Plan beneficiary, Mary, is a necessary <u>equitable remedy</u>, as Mary relied on Ronald's earning for her necessary support needs.

144. As a result of this breach, Mary is entitled to the <u>equitable remedy</u> of specific performance of the Offer Letter, pursuant to 29 U.S.C. § 1132(a)(3), for this misconduct by Defendants, specifically as it relates to Ronald's potential future earnings, bonuses and stock awards at Defendants and/or any other position or company.

145. Mary reserves her right to further plead and demand for any other available <u>equitable relief</u>.

**WHEREFORE,** the Plaintiffs demand judgment as follows:

(a) On the first cause of action, awarding Plaintiffs damages in the sum of at least $6,586,000.00 against Defendants Amazon.com, Inc. and Amazon.com Services, Inc.;

(b) On the second cause of action, awarding Plaintiffs damages in the sum of at least $6,586,000.00 against Defendants Amazon.com, Inc. and Amazon.com Services, Inc.;

(c) On the third cause of action, awarding Plaintiffs damages in the sum of at least $6,586,000.00 against Defendants Amazon.com, Inc. and Amazon.com Services, Inc.;

(d) On the fourth cause of action, awarding Plaintiff Mary Gipson damages in the amount of short term disability benefits otherwise due to Ronald W. Ashley, for the period from May

4, 2016 to August 28, 2016, against Defendants Amazon.com, Inc. and Amazon.com Services, Inc.; and,

(e) On the fifth cause of action, awarding Plaintiff Mary Gipson, an award of relief in equity, that a Judge at trial deems appropriate under the circumstances, including but not limited to a surcharge, restitution, front pay and specific performance, against Defendants Amazon.com, Inc. and Amazon.com Services, Inc.;

(f) Awarding such other and further relief as the Court deems just and proper, including an award of punitive damages, if deemed appropriate by this Court, together with reasonable attorney's fees, statutory interest and the costs and disbursements of this action.

Dated: March 18, 2019  
New York, New York

Yours, etc.,

**KAPIN PLLC**  
*Attorneys for Plaintiffs*

_____  
MICHAEL J. KAPIN, ESQ.  
1133 Broadway - Suite 1001  
New York, NY 10010  
(212) 513-0500